**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JEFFERY M.,**

                              **Plaintiff,**


        **v.**                                           **3:19-CV-435**
                                                              **(TJM)**

**COMMISSIONER OF SOCIAL SECURITY,**

                              **Defendant.**
_____

**THOMAS J. McAVOY,**
**Sr. U. S. District Judge**

### DECISION & ORDER

Plaintiff Jeffery M. brings this action pursuant to the Social Security Act, 42 U.S.C. §

405(g), for review of a final determination by the Commissioner of Social Security denying

his application for benefits.  Plaintiff alleges that the Administrative Law Judge's ("ALJ")

decision denying his application was not supported by substantial evidence and contrary to

the applicable legal standards.  Pursuant to Northern District of New York General Order

No. 8, the Court proceeds as if both parties had accompanied their briefs with a motion for

judgment on the pleadings.

## I.    PROCEDURAL HISTORY

Plaintiff applied for Disability Insurance Benefits ("Title II") and Supplemental

Security Income Benefits ("Title XVI") from the Social Security Administration on June 30,

2015. See Social Security Administrative Record ("R"), dkt. # 9, at 177-189.  The Social

Security Administration denied Plaintiff's applications on September 9, 2015.  Id. at 52-66.

Plaintiff appealed, and Administrative Law Judge Kenneth Theurer held a hearing on July

26, 2017, where a Vocational Expert testified.  Id. at 12-50.  At the hearing, Plaintiff

withdrew his request for Title II benefits.  Id. at 70.  The ALJ issued an unfavorable

decision on October 6, 2017, dismissing Plaintiff's request for Title II benefits on Plaintiff's

request and finding that Plaintiff had not demonstrated he was eligible for benefits under

Title XVI.  Id. at 66-82.  Plaintiff appealed, and the Social Security Appeals Council denied

her request for review on September 5, 2018.  Id. at 4-5. Plaintiff then filed the instant

action in this Court.  This Court has jurisdiction over the ALJ's decision pursuant to 42

U.S.C. §§ 405(g) and 1383(c)(3).

## II.    FACTS

The Court will assume familiarity with the facts and set forth only those facts

relevant to the Court's decision in the body of the decision below.

## III.    THE ADMINISTRATIVE LAW JUDGE'S DECISION

The question before ALJ Theurer was wether Plaintiff was disabled under the Social

Security Act.  The ALJ engaged in the five-step analysis required by 20 C.F.R. §

416.920(a) to determine whether a claimant qualifies for disability benefits.  See R. at 70-

82.

> The Social Security Administration regulations outline the five-step,
> sequential evaluation process used to determine whether a claimant is
> disabled: (1) whether the claimant is currently engaged in substantial gainful
> activity; (2) whether the claimant has a severe impairment or combination of
> impairments; (3) whether the impairment meets or equals the severity of the
> specified impairments in the Listing of Impairments; (4) based on a "residual
> functional capacity" assessment, whether the claimant can perform any of his
> or her past relevant work despite the impairment; and (5) whether there are
> significant numbers of jobs in the national economy that the claimant can
> perform given the claimant's residual functional capacity, age, education, and
> work experience.

McIntyre v. Colvin, 758 F.3d 146, 150 (2d Cir. 2014).

The ALJ applied these five steps.  The ALJ found at Step 1 that Plaintiff had not engaged in substantial gainful activity since June 2, 2015, the date on which he applied for benefits.  Id. at 72.  At Step 2, the ALJ found that Plaintiff suffered from the severe impairments of degenerative disc disease of the cervical and lumbar spines, and left shoulder injury status post surgery.  Id. at 73. The ALJ noted that Plaintiff alleged he could not work because of a "torn rotator cuff, degenerative disc disease, and severe stenosis." Id.

The ALJ found several severe impairments in Plaintiff's medical history.  Id.  He found that "the claimant's neck, back and shoulder impairments, considered in combination, significantly limit" Plaintiff's "ability to perform basic work activities" and were thus "severe."  Id.  The ALJ also concluded the Plaintiff suffered from several non-severe or non-medically determinable impairments.  Id. at 73-74.  While noting that Plaintiff's height and weight qualified him as "obese," the ALJ concluded that no record evidence indicated that Plaintiff's "obesity causes him any functional limitations or" contributes "significantly to the limiting effects of his back impairment."  Id. at 73.  As such, Plaintiff's obesity did not qualify as "severe" under the regulations.  Id.  Still, as required by the Social Security regulations, the ALJ "considered the effects of" Plaintiff's "obesity in determining whether" Plaintiff's "impairments [met] or medically [equalled] a listed impairment[.]"  Id. The ALJ also found that Plaintiff had complained of elbow pain late in 2015.  Id. at 74.  At the same time, examinations showed no serious injury, and Plaintiff "retained full range of motion of his elbows during the consultative examination."  Id.  The ALJ therefore found

3

that Plaintiff's elbow pain was "not a severely medically determinable impairment at any time relevant to this decision." Id.  Likewise, the knee pain that Plaintiff cited from a May 2015 fall did not amount to a "severe medically determinable impairment." Id.  The record contained mention of gastroesophageal reflux disease and hyperlipidemia, but these conditions did not cause any limitations and were not severe, the Administrative Law Judge found. Id.  Medical tests also failed to support Plaintiff's complaints of hearing loss and ringing in his ears. Id.  Plaintiff did not have "a medically determinable impairment" in that respect either. Id.

At Step 3, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically exceeded the severity of a listed impairment in 20 C.F.R. 416.920(d), 416.925 and 416.926.  Id.  The ALJ considered whether Plaintiff suffered from a "major dysfunction of the joint," but found no evidence that Plaintiff suffered from "an inability to perform fine and gross movements effectively[.]" Id.  Moreover, the medical evidence demonstrated that Plaintiff "recovered without complication" from surgery he had undergone "shortly after" he injured the shoulder. Id.  Plaintiff's back and neck impairments also failed to meet the severity requirements, the ALJ found. Id.  The medical evidence did not support such a finding. Id.

At step four, the ALJ held that Plaintiff had the residual functional capacity "to lift and carry 20 pounds occasionally and ten pounds frequently, sit for one hour at a time for a total of six hours in an eight-hour day, stand for 30 minutes at a time, and stand and/or walk for four hours in an eight-hour day with normal breaks." Id. at 75.  Plaintiff could stand for 30 minutes at one time and sit for an hour. Id.  After that hour, he would need to "alternate for five minutes." Id.  Plaintiff could "remain on task." Id.  He could climb ramps

4

or stairs "occasionally," but could "never climb ladders, ropes, or scaffolds."  Id.  He could "occasionally balance, stoop, kneel, crouch, and crawl."  Id.

In making this determination, the ALJ assessed the medical evidence and opinions. Id. at 75-80.  The ALJ noted that Plaintiff "allege[d] he is unable to work due to a torn rotator cuff, degenerative disc disease, and severe stenosis."  Id. at 75.  The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[.]" Id.  At the same time, however, Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.[]"  Id.  The ALJ pointed out that, despite claims that he had long suffered from various issues, Plaintiff had not sought treatment from a doctor for any of his conditions before 2015.  Id. at 75-76.  For example, while Plaintiff told a provider in May 2015 that he had suffered from back pain for 20 years, the record first noted a complaint on the issue in May 2015.  Id. at 76.  At the same time, examinations showed "tenderness and limited range of motion in his upper lumbar" region as well as "degerative disc disease."  Id.  While X-rays and MRIs of Plaintiff's neck in 2016 showed degenerative changes, examinations revealed "only mildly reduced range of motion in his cervical spine."  Id.  The ALJ noted as well that an MRI in May 2015 showed Plaintiff suffered a "full thickness rotator cuff tear of supraspinatus tendon[.]"  Id.  That led to shoulder surgery in October 2015.  Id.

While these could be "expected to cause some functional limitations[,] . . . the clinical findings during examinations and" plaintiff's "reported activities suggest that these conditions are not as severe as he alleges."  Id.  Plaintiff did not seek any additional treatment for his shoulder after October 2015.  Id.  An examination of the shoulder and

lumbar spine in August 2016 came back normal.  Id.  In November 2016, Plaintiff

complained of "numbness in his arms[,]" but an "[e]xamination of his extremities, cervical

spine, lumbar spine, shoulders, elbows, and hands was normal[.]" Id.  He did not seek

treatment.  Id.  A December 2016 examination showed Plaintiff with a normal gait, and he

did not use any assistive devices.  Id.  He walked on his heels and toes without difficulty.

Id.  Though his cervical spine has a "somewhat limited range of motion," he had "no

tenderness" there.  Id.  Both upper extremities maintained "full motor strength[.]"  Id.

"[S]ensation was intact" and Plaintiff suffered from "no sensory or strength deficits in his

lower extremities."  Id.  A 2016 examination "suggest[ed] that the claimant has no

limitations for standing, walking, using his upper extremities or performing postural

activities."  Id.  While Plaintiff had some "physical therapy for his back," he had "no ongoing

treatment."  Id.  While a recent MRI showed "stenosis," his "gait was consistently normal."

Id.  He did not report any neck pain until 2016, and that did not demand "ongoing

treatment."  Id.  He "declined physical therapy or injections for his neck."  Id.

        The ALJ noted that "clinical findings during the consultative examination in August

2015 do not support the claimant's allegations regarding the severity of his conditions."  Id.

at 77.  Plaintiff's "gait was normal and he appeared in no acute distress" during that

examination.  Id. While Plaintiff could not "walk on his heels or toes without difficulty" and

could only "[squat] to 50% . . . he used no assistive devices and was able to rise from a

chair without difficulty."  Id.  Plaintiff did not need any "help changing for the exam or

getting on or off the exam table."  Id.  Plaintiff "had somewhat limited range of motion of his

lumbar spine, but" could flex to 60 degrees, extend to 10 degrees, laterally flex to 25

degrees, and rotate to 25 degrees bilaterally."  Id.  Though Plaintiff suffered from

"somewhat limited range of motion of his hips," he could "flex/extend to 80 degrees on the right and 70 degrees on left, internally rotate to 30 degree[s] on the right and 25 degrees on the left, externally rotate to 40 degrees on the right and 35 degrees on left, and abduct to 10 degrees bilaterally." Id. Plaintiff had "full range of motion of both knees." Id. Though Plaintiff suffered from "decreased range of motion in his ankles," he could "dorsiflex to 15 degrees and plantar flex to 30 degrees on his right and to 25 degrees on the left." Id. Plaintiff also "had positive straight leg raise tests and sciatic notch tendernes[,]" but "no sensory or strength deficits in his lower extremities." Id. Such "findings suggest that the claimant's back impairment would cause some postural and exertional limitations, but not as severe as" Plaintiff "alleges." Id.

The consultative examination also addressed Plaintiff's cervical spine, the ALJ noted. Id. That exam found "limited range of motion" in that area, but showed Plaintiff could "flex to 40 degrees, extend to 30 degrees, rotate to 70 degrees bilaterally, and laterally flex to 20 degrees bilaterally." Id. Plaintiff "had limited range of motion of his shoulders," but could "elevate to 150 degrees on the right and to 90 degrees on the left, abduct to 150 degrees on the right and to 60 degrees on the left, abduct to 30 degrees on the right and to 25 degrees on the left[.]" Id. Plaintiff could also "rotate to 40 degrees on the right and to 35 degrees on the left, and externally rotate to 90 degrees on the right and 85 degrees on the left." Id. That exam, the ALJ pointed out, came "shortly before the claimant's shoulder surgery." Id. Plaintiff also "retained full range of motion of his elbows and wrists," and had "no sensory or stregth deficits in his upper extremities." Id. "His hand and finger dexterity was intact" and maintained "full grip strength bilaterally." Id. Such findings "suggest[ed] that" Plaintiff had "no limitations for using his hands for fine or gross

7

motor activities but" could "have some limitations for lifting or carrying with his left upper extremity." Id. Any limitations before surgery, the ALJ found, seem to have been reduced after that operation, since "his range of motion was normal during his post-operative exams in 2016." Id. Plaintiff "waived his left arm above his head at the hearing and testified that he has no major limit with range of motion of the left shoulder." Id. He testified, however, that "he would have difficulty lifting a picture [sic] of water over his head with his left arm." Id. As such, the ALJ found that Plaintiff "has no limitations for reaching and only residular limitations for lifting and carrying after his shoulder surgery." Id.

The ALJ concluded that Plaintiff's "activities of daily living do not support his allegations regarding the severity of his conditions." Id. Plaintiff told the consultative examiner that he "cooks, cleans, does laundry, and shops in stores." Id. Plaintiff told the examiner "he showers and dresses himself," that "he lives alone, cares for his cat, prepares his own meals, cleans his place, uses the computer, and dresses and bathes himself." Id. While Plaintiff did not have a driver's license and did not drive, that situation was "not related to his medical conditions." Id. Plaintiff could not do other work, he testified, "because carpentry was all he knows and all he has ever done." Id. at 77-78. Plaintiff's lost driver's license and limited work history were not a result of his medical condition, and did "not impact his residual functional capacity." Id. at 78. "His reported activities of daily living suggest that he is able to lift and carry and stand, walk, and sit consistent with light work." Id.

The ALJ also discussed the opinion evidence. The ALJ considered the opinion of consultative examiner Gilbert Jenouri, MD. Id. at 78-79. Dr. Jenouri examined Plaintiff twice. Id. at 78. His first examination came in February 2015, at the request of the

Broome County, New York Department of Social Services.  Id.  During this examination,

Dr. Jenouri found that Plaintiff could not "participate in any activities except treatment or

rehabilitation."  Id.  The ALJ noted that "[a]t that time, the [Plaintiff] had not sought any

treatment for his back or his shoulder because he lacked insurance coverage."  Id.  Dr.

Jenouri found "moderate limitations for walking, standing, pushing, pulling, climbing stairs,

and bending[.]"  Id.  Jenouri concluded, however, that Plaintiff could "perform each of these

ativities up to four hours per day."  Id.  Plaintiff could also "lift or carry 20 pounds

occasionally and ten pounds frequently" and did not have any "limitations for seeing,

hearing, speaking, or using his hands."  Id.  Jenouri's opinion, the ALJ found, was

"consistent with light exertional work."  Id.  The ALJ also found that Dr. Jenouri's report

found Plaintiff "had no prior treatment for his back or shoulder."  Id.  The examiner also

"had not reviewed any prior evidence and that" Plaintiff "was not taking any medications."

Id.  The report, the ALJ noted, did not include "any clinical findings."  Id.

        The ALJ also described Dr. Jenouri's second report, from August 2015.  There, Dr.

Jenouri concluded that Plaintiff had "mild restrictions for walking, standing, sitting, bending,

climbing stairs, lifting, and carrying."  Id.

        The ALJ made the following findings about Dr. Jenouri's report:

        Dr. Jenouri's opinions are given partial weight in determining the claimant's residual
        functional capacity.  Her [sic] August 2015 opinion is given great weight because it is
        supported by his findings upon examining the claimant. [T]he claimant's gait was
        normal and he appeared to be in no acute distress.  The claimant was unable to
        walk on his heels or toes without difficulty and only squatted to 50%.  However, he
        used no assistive devices and was able to rise from a chair without difficulty.  He
        needed no help changing for the exam or getting on an[d] off the exam table.  The
        claimant had somewhat limited range of motion of his lumbar spine, but was able to
        flex to 60 degrees, extend to 10 degrees, laterally flex to 25 degrees, and rote to 25
        degrees bilaterally.  He had somewhat limited range of motion of his hips, but was
        able to flex/extend to 80 degrees on the right and 70 degrees on the left, internally

9

rotate to 30 degrees on the right and to 25 degrees on the left, externally rotate to 40 degrees on the right and to 35 degrees on the left, and adduct to 10 degrees bilaterally.  He retained full range of motion of both knees.  He had decreased range of motion in his ankles, but was able to dorsiflex to 15 degrees and plantar flex to 30 degrees on the right and 25 degrees on the left.  He had positive straight leg raise texts and sciatic notch tenderness.  However, he had no sensory or strength deficits in his lower extremities.  These findings suggest that the claimant's back impairment would cause some postural and exertional limitations, but not as severe as claimant alleges.

During the consultative examination, the claimant had limited range of motion of his cervical spine, but was able to flex to 40 degrees, extend to 30 degrees, rotate to 70 degrees bilaterally, and laterally flex to 20 degrees bilaterally.  The claimant had limited range of motion of his shoulders, but was able to elevate to 150 degrees on the right and to 90 degrees on the left, abduct to 150 degrees on the left, internally rotate to 40 degrees on the right and to 35 degrees on the left, and externally rotate to 90 degrees on the right and 80 degrees on the left.  Notably, this exam was shortly before the claimant's shoulder surgery.  During the exam, he retained full range of motion of his elbows and wrists.  The claimant had no sensory or strength deficits in his upper extremities.  His hand and finger dexterity was intact and he retained full grip strength bilaterally.

Dr. Jenouri's February 2015 opinions regarding the claimant's limitations are also given some weight because they are consistent with the diagnostic images and clinical findings documented in the caimant's medical record and consistent with the claimant's reported activities of daily living.  However, his conclusion that the claimant is unable to participate in any activities other than treatment is rejected because there are no clinical findings to support this.  Moreover, this is contradicted by her [sic] February 2015 opinion and August 2015 opinion regarding the claimant's ability to lift, carry, stand, walk, sit, and perform personal activities.  While the Broome County Department of Social Services exempted the claimant from work activity based on Dr. Jenouri's February 2015 opinion, I reject his opinion that the claimant is unable to do anything other than treatment.

Id. at 78-79 (internal citations to the record omitted).

The ALJ also examined the opinion of Gina Callahan, PA.  Id. at 79.  In June 2017, Callahan concluded that Plaintiff would miss more than four days of work and frequently have symptoms so severe that they would interfere with his attention and concentration. Id.  She found he could "rarely lift less than ten pounds, stand for only 30 mintues at a time and stand and/or walk for less than two hours in an eight-hour day, and sit for one hour at

10

a time for a total of about two hours in an eight-hour day." Id.  Callahan concluded that

Plaintiff could not perform even "low stress jobs," and needed to be allowed "to change

positions at will and needs breaks every 20 to 30 minutes." Id.  Plaintiff, she found, must

use a cane, and could only "rarely twist, stoop, crouch, squat, or climb ladders[.]" Id.  He

could, however, "frequently climb stairs." Id.  He could "frequently handle, grasp, turn, and

twist objects and perform fine manipulation" and "occasionally reach in all directions." Id.

Callahan found that Plaintiff's tear to the left rotator cuff and his degenerative disc disease

caused his problems.

The ALJ made the following finding about this evidence:

This opinion is given little weight because it is not supported by the evidence of
record.  As noted above, the claimant's gait was normal.  He has no sensory or
strength deficits in his lower extremities.  He has not had anything other than the
most conservative treatment for his back, consisting of pain medications, which he
testified he rarely uses, and physical therapy.  He testified that he started using a
cane, but the medical evidence does not show that a medical provider prescribed a
cane to him.  Therefore, Ms. Callahan's opinion that the claimant is only able to
stand or walk for less than two hours and needs a cane is rejected.  Similarly, her
opinion that the claimant is unable to work in even a low stress job is rejected
because the evidence of record does not show that the claimant has any mental
impairment or any limitations in his ability to deal with stress.  Her opinion that the
claimant has limitations for reaching is contradicted by the claimant's testimony that
he has no problems using his right arm and has no significant limitation in range of
motion in his left arm.  As for her opinion regarding the claimant's ability to sit, lift,
and carry, the objective medical evidence does not support this.  The claimant's
shoulder impairment and neck impairment would not be expected to cause him any
limitations for sitting.  As for his back impairment, the evidence does not suggest
that he would only be able to sit for two hours in a day and any need for him to
change positions or stretch is accommodated in the above-detailed residual
functional capacity.

Id. at 79-80.  The ALJ concluded that "the diagnostic images, the clinical findings, the

claimant's minimal treatment, the claimant's activities of daily living, and Dr. Jenouri's

opinions relating to" Plaintiff's "ability to lift, carry, sit, stand, walk, climb, and use his hands"

all supported the residual functional capacity" the ALJ assigned.  Id. at 80.

At Step Five, the ALJ found that Plaintiff could not perform any past relevant work. Id.  The ALJ also found that, at fifty years old, Plaintiff was "an individual closely approaching advanced age" when he filed his application.  Id.  The ALJ next found that "jobs exist in significant numbers in the national economy that" plaintiff could do, "[c]onsidering" his "age, education, work experience, and residual functinoal capacity[.]"  Id. at 81.  The ALJ noted that his RFC had included limitations that affected his ability to perform the entire class of light work, and the ALJ therefore turned to a vocational expert to determine "whether jobs exists in the national economy for an individual with" Plaintiff's "age, education, work experience, and residual functional capacity" could perform.  Id.  The expert pointed to several positions, such as "office helper, photocopy machine operator, and parking lot attendant."  Id.  Relying on this testimony, the ALJ found "that, considering the [Plaintiff's] age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  Id.  The ALJ therefore concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, since June 2, 2015, the date the application was filed."  Id. 82.  Plaintiff, the ALJ concluded, was not disabled within the meaning of the Act.  Id.

## IV.    STANDARD OF REVIEW

The Court's review of the Commissioner's determination is limited to two inquiries. See 42 U.S.C. § 405(g).  First, the Court determines whether the Commissioner applied the correct legal standard. See Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo

v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990);

Shane v. Chater, No. 96-CV-66, 1997 WL 426203, at *4 (N.D.N.Y July 16, 1997)(Pooler,

J.)(citing Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)).  Second, the Court must

determine whether the Commissioner's findings are supported by substantial evidence in

the administrative record. See Tejada, 167 F.3d at 773; Balsamo, 142 F.3d at 79; Cruz,

912 F.2d at 11; Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).  A

Commissioner's finding will be deemed conclusive if supported by substantial evidence.

See 42 U.S.C. § 405(g); see also Perez, 77 F.3d at 46; Townley v. Heckler, 748 F.2d 109,

112 (2d Cir. 1984)("It is not the function of a reviewing court to determine *de novo* whether

a Plaintiff is disabled.  The [Commissioner's] findings of fact, if supported by substantial

evidence, are binding.")(citations omitted).

        In the context of Social Security cases, substantial evidence consists of "more than

a mere scintilla" and is measured by "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401,

91 S. Ct. 1420, 1427, 28 L. Ed.2d 842 (1971)(quoting Consolidated Edison Co. v. NLRB,

305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)).  Where the record supports

disparate findings and provides adequate support for both the Plaintiff's and the

Commissioner's positions, a reviewing court must accept the ALJ's factual determinations.

See Quinones v. Chater, 117 F.3d 29, 36 (2d Cir. 1997)(citing Schauer v. Schweiker, 675

F.2d 55, 57 (2d Cir. 1982)); Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990).  Although

the reviewing court must give deference to the Commissioner's decision, a reviewing court

must bear in mind that the Act is ultimately "'a remedial statute which must be 'liberally

applied;' its intent is inclusion rather than exclusion.'" <u>Vargas v. Sullivan</u>, 898 F.2d 293, 296 (2d Cir. 1990)(quoting <u>Rivera v. Schweiker</u>, 717 F.2d 719, 723 (2d Cir. 1983)).

## V.   ANALYSIS

Plaintiff points to several alleged errors by the ALJ.  The Court will consider each in turn.

### A.   Residual Functional Capacity

Plaintiff first argues that substantial evidence does not support the RFC the ALJ assigned.  Nothing in the record supports the "very specific abilities and limitations" the ALJ assigned, Plaintiff contends.  The opinion of the consultative examiner was too vague to provide substantial evidence for the ALJ's opinion, and changes in Plaintiff's condition after the examination made the opinion stale.  Plaintiff argues that he ALJ failed to rely on an opinion that actually addressed Plaintiff's limitations in detail.

At issue here is how the ALJ assessed Plaintiff's RFC.  In making the disability determination, "the ALJ must determine whether a claimant who has a severe impairment nonetheless has the 'residual functional capacity ('RFC') to perform work available to him." <u>Genier v. Astrue</u>, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1520, 404.1560). The RFC is "'the most [a claimant] can still do despite [his] limitations.'" <u>Id.</u> (quoting 20 C.F.R. § 416.945(a)(1)).  "In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations." <u>Jackson L. v. Comm'r of Soc. Sec.</u>, No. 19cv785, 2020 U.S. Dist. LEXIS 101319, *19 (N.D.N.Y. June 10, 2020) (citing 20 C.F.R. §§ 404.1545, 416.95).  "Where an ALJ's

analysis" of the RFC "affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that additional analysis would be unnecessary or superfluous," additional analysis is unnecessary. Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013).  "Remand may be appropriate, however, where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review."  Id.  "[T]he ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Genier, 606 F.3d at 49 (internal citations omitted).

Plaintiff offers several grounds in arguing that substantial evidence did not support the ALJ's findings in this respect.

### i.    Use of Dr. Jenouri's Opinions

First, Plaintiff argues that the ALJ erred in relying on opinions from Dr. Jenouri in crafting the RFC.  Dr. Jenouri's opinion in February 2015 came before a fall Plaintiff suffered in May 2015, and his August 2015 opinion came before he had shoulder surgery that fall.  Moreover, the limitations Dr. Jenouri stated in his August opinion were too vague to support many of the limitations the ALJ assigned.  The ALJ, Plaintiff claims, should not have relied on these opinions.

Plaintiff offers several critiques of how the ALJ used Dr. Jenouri's opinions. First, Plaintiff complains that the ALJ should not have used Jenouri's opinions because they did

15

not acknowledge other injuries that occurred between the February and August opinions, and then a shoulder injury that came later.  The Plaintiff points to a fall that came in May 2015 which he alleges caused additional injuries.  The record reveals that Plaintiff sought treatment at Orthopedic Associates in Binghamton, New York on May 5, 2015.  R. at 249. He sought an "evaluation of both his lumbar spine as well as left shoulder pain."  Id. Plaintiff reported that "he has been struggling with back pain for the last 20 plus years" and that he "had chiropractic treatment" twenty years before, and had also had massage therapy.  Id.  He reported lower back pain and pain down the left leg.  Id.  The Plaintiff explained that he had injured his left shoulder two years earlier, but did not obtain treatment because he lacked insurance.  Id.  He sought additional examination and complained of nighttime pain.  Id.  He also complained of "a recent fall while mowing the grass" that caused "significant pain in both the left shoulder as well as the right knee."  Id.

Examination showed "diffuse tenderness throughout the lumbar spine," and pain that increased with "[r]otation and extension."  Id.  "Flexation was satisfactory."  Id. at 249-50.  X-rays of the lumbar spine showed "multi-level degenerative changes."  Id. at 250.  An examination of the left shoulder "revealed tenderness over the AC joint as well as anterial proximal aspect of the humerous."  Plaintiff had a "restricted" "range of motion."  Id.  He had "[f]orward elevation and abduction to about 40 degrees on exam[.]" Id.  With reference to the knee, Plaintiff was "weightbearing as tolerated."  Id.  He had no "complaint of swelling" and "deni[ed] any locking, catching" or "instability."  Id.  An examination showed "a moderate effusion" and "mild eccymosis."  Id. at 250.  Plaintiff had tenderness "over the medial aspect of the knee" but had "full extension of 110 degrees of flexion" and the joint was "stable."  Id.  In addition, the "[r]ight lower extremity [was] neurovascularly intact."  Id.

Plaintiff left with a diagnosis of "1) Multi-level degenerative changes of the lumbar spine with intermittent left leg radiculopathy.  2) Left shoulder injury, likely rotator cuff tear.  3) Right knee pain."  Id. He planned to have x-rays of his knee and shoulder, as well as an MRI of the left shoulder.  Id.  Plaintiff also planned to begin physical therapy for his knee. Id. at 250.

An x-ray of the right knee on May 7, 2005 revealed a "[s]mall joint effusion, prepatellar swelling," but "[n]o fracture or dislocation."  Id. at 255.  The "[j]oint space [was] preserved" and the exam showed "[n]ormal mineralization."  Id.  An office visit that day showed Plaintiff complaining of "aching" pain in his right knee due to "an injury."  Id. at 256. Plaintiff's pain was "aggravated by bending and climbing (and descending) stairs.  Id.  That office visit also found that Plaintiff's back pain represented a problem that was "stable."  Id. The "[l]ocation of pain is [the] lower back," but Plaintiff suffered "no radiation of pain."  Id. He experienced "an ache," but "denie[d] aggravating" or "relieving factors."  Id.  The pain had not changed since Plaintiff's last visit.  Id.  Plaintiff's shoulder pain had continued after his fall and an orthopedist had ordered an MRI.  Id.  An MRI performed on May 13, 2015 revealed a "[c]ontusion [to the] posterior aspect humeral head," a "[p]artial full thickness tear posterior supraspinatus tendon," a "[t]iny tear" to the "anterior insenion supraspinatus tendon," "[f]luid within the subacrominal-subdeltoid bursa, subcoracoid bursa and superior subscapularis recess," and "[t]endinosis of the infraspinatus tendon."  Id. at 284.  An MRI of the lumbar spine performed the same day showed "[m]ultilevel degenerative changes and disc disease with stenosis."  Id. at 285.  While the record shows additional treatment for the shoulder, including surgery, and continued back pain, the record does not reveal any additional treatment on Plaintiff's injured knee.  Id. at 286-312.

The ALJ acknowledged this medical treatment and described the limitations that the examinations found to Plaintiff's neck, back and shoulder.  Id. at 76.  Plaintiff's complaint is in part that the ALJ should not have used Dr. Jenouri's opinion from February because that opinion came before a fall that worsened his condition.  As explained above, however, the medical evidence indicates that the fall did not alter the condition of Plaintiff's lumbar spine, but instead caused a knee injury and exacerbated a shoulder problem.  The medical evidence also shows that the knee injury did not cause lingering problems and that the shoulder injury received medical attention that solved the problem.  Moreover, the ALJ, in assessing Dr. Jenouri's examination of the Plaintiff, acknowledged the shoulder injury and the limitations it caused, but also noted that "this exam was shortly before the claimant's shoulder surgery."  Id. at 79.  The ALJ had already concluded, based on medical evidence in 2016, that Plaintiff "sought no further treatment for his shoulder after his October 2015 surgery" and that an August 2016 shoulder and lumbar spine examination "was normal." Id. at 76.  The Court therefore cannot find that the ALJ relied on "stale" portions of the consultative examination, since he acknowledged that Plaintiff's medical condition had evolved between and after the two examinations, cited medical evidence that explained the changing state of Plaintiff's shoulder, and relied on those portions of the opinions that addressed medical conditions that still remained fairly consistent during the relevant time. Substantial evidence supports these findings.

Plaintiff also complains that Dr. Jenouri's finding in his August 2015 report that Plaintiff had "mild restriction[s] walking, standing, and sitting long periods; bending, stair climbing, lifting, and carrying," but that these limitations were "vague" and that, even combined with his clinical findings, did not support the RFC that the ALJ assigned.

18

Plaintiff's complaint here is that the expert opinion the ALJ utilized in establishing the RFC was insufficient to establish the particular limitations the ALJ assigned.  An RFC is not supported by substantial evidence when the evidence on which the ALJ relies is "vague" or unclear about the sort of limitations a person requires.  See Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) (finding that the lifting restrictions the RFC established by the ALJ was not supported by substantial evidence because the medical opinion on which the ALJ relied was "remarkably vague" in the way it described the plaintiff's condition). Still, "the opinions of treating or consulting physicians need not be reduced to any particular formula," but must instead "permit the ALJ, a layperson notwithstanding [his] considerable and constant exposure to medical evidence, to make the necessary inference that" a plaintiff can perform particular work.  Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000). Moreover, just because one medical source contains vague or incomplete findings does not mean that substantial evidence did not exist to support the ALJ's findings; the Court is to consider the record as a whole and if "the record contain[s] sufficient other evidence supporting the ALJ's determination" and "the ALJ weighed all of that evidence when making his residual functional capacity finding, there was no 'gap' in the record and the ALJ did not rely on his own 'lay opinion.'" Johnson v. Colvin, 669 Fed. Appx. 44, 46 (2d Cir. 2016) (quoting Tankisi v. Comm'r of Soc. Sec., 521 Fed. Appx. 29, 34 (2d Cir. 2013)).

In considering the record as a whole and the ALJ's evaluation of that evidence, the Court cannot find that the ALJ improperly relied on Dr. Jenouri's opinions, or that the opinions were too vague to rely on.  While Dr. Jenouri indeed found "mild restrictions" in certain areas, the ALJ also explained in detail what limitations those restrictions required, how Dr. Jenouri's examination supported those restrictions, and how the other medical

19

evidence of record also provided evidence for the limitations he assigned.  See R. at 78.

Dr. Jenouri's opinion, particularly since it included the results of an examination, was not so

vague that the ALJ could not use the opinion in crafting the RFC.  The ALJ concluded that

the limitations he assigned were "consistent with ability to perform less than the full range

of light work as defined in 20 C.F.R. 416.967(b)."[1]  R. at 75.  Courts have found such

descriptions of limitations by an expert sufficient to conclude that a person could perform

light work as defined by the Social Security Administration.  See, e.g., Lewis v. Colvin, 548

Fed.Appx. 675, 678 (2d Cir. 2013) ("the ALJ's determination that Lewis could perform 'light

work' is supported by Dr. Datta's assessment of 'mild limitations for prolonged sitting,

standing, and walking,' and direction that Lewis should avoid 'heavy lifting, and carry.'");

Fullenweider-Harris v. Comm'r of Soc. Sec., No. 19cv424, 2020 U.S. Dist. LEXIS 109870,

*15-16 (W.D.N.Y. June 23, 2020)(an examining physician's opinion that plaintiff had "mild

to moderation limitation for prolonged walking, bending, and kneeling" supported a finding

of light work); James P. v. Berryhill, 18cv397, 2020 U.S. Dist. LEXIS 5013 (N.D.N.Y. Jan.

13, 2020) ("Ultimately, Dr. Jenouri's assessment of 'mild limitations' in plaintiff's ability to

---

[1]That section provides that:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be
very little, a job is in this category when it requires a good deal of walking or
standing, or when it involves sitting most of the time with some pushing and pulling
of arm or leg controls.  To be considered capable of performing a full range or wide
range of light work, you must have the ability to do substantially all of these
activities.  If someone can do light work, we determine that he or she can also do
sedentary work, unless there are additional limiting factors such as loss of fine
dexterity or inability to sit for long periods.

20 C.F.R. 416.967(b).

sit, stand, and walk for long periods is consistent with an RFC for light work.").  The ALJ explained how Dr. Jenouri's opinion reflected that examination, and why the results of the examination made certain restrictions unnecessary.

Plaintiff next argues that the ALJ improperly substituted his opinion for that of medical experts.  He argues that the ALJ "clearly interpreted the raw medical data within the treatment notes to create limitations" because "none of the treatment notes or examination findings summarized by the ALJ address the ability to stand, walk, reach, lift, carry, perform manipulations, or perform postural activities."  This is error, Plaintiff claims, "because the ALJ found very specific abilities and limitations and failed to tie the evidence corroborating the very specific abilities and limitations."

Plaintiff is correct that, an "'ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.'"  Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (quoting McBrayer v. Secretary of Health and Human Servs., 712 F.2d 795, 799 (2d Cir. 1983)). Here, however, the medical records do address the limitations that Plaintiff contends they do not.  Dr. Jenouri examined the Plaintiff, and the ALJ related the limitations that Plaintiff's back issues caused to his ability to use his lower spine.  R. at 78.  The exam also addressed Plaintiff's ability to use his hands, finding that Plaintiff's "[e]lbows, wrists, and hands" had "full ROM bilaterally."  Id. at 270.  Plaintiff had an "intact" "hand and finger dexterity" and his "[g]rip strength" was "5/5 bilaterally."  Id.  The records also discussed Plaintiff's ability to use his shoulders and his ability to walk and move: he "appeared to be in no acute distress."  Id. at 269.  He a "normal" "[g]ait," though he was "[u]nable to walk on heels and toes without difficulty."  Id.  He could "[s]quat . . . only 50%."  Id.  Plaintiff did not need "assistive devices" and "no help changing for exam or getting on and off [the] exam

table." Id.  The Court finds that the ALJ used the medical evidence to determine the extent

of Plaintiff's limitations and did not substitute his own opinion for that of medical experts.

Plaintiff's complaint could be read to be that the ALJ assigned limitations that were not

specifically stated in the medical evidence, but those limitations were directly related to that

evidence and not mere conjecture on the ALJ's part.  To require more detail about the

exact limitations would be to ask the physicians to establish the RFC, which is not their job.

Here, the ALJ used the medical experts' findings about the nature and extent of the

Plaintiff's injuries and limitations to help establish the RFC.  As the ALJ explained, the RFC

"is supported by the diagnostic images, the clinical findings, the claimant's minimal

treatment, the claimant's activities of daily living, and Dr. Jenouri's opinion relating to his

ability to lift, sit, stand, walk, climb, and use his hands."  Id. at 80.  The Court will deny the

Plaintiff's motion in this respect.

### ii.     Weight Assigned to Opinion of PA Callahan

Plaintiff next argues that the ALJ erred in assigning little evidentiary weight to the

opinion of Gina Callahan, PA.  Plaintiff argues that Callahan qualifies as an other medical

source under the Social Security regulations.  "Opinions from medical sources that are not

considered acceptable medical sources are 'important and should be evaluated on key

sources such as impairment severity and functional effects.'" Saxon v. Astrue, 781

F.Supp.2d 92, 103 (N.D.N.Y. 2011) (quoting Anderson v. Astrue, 2009 U.S. Dist. LEXIS

77602, 2009 WL 2824584, at *9 (E.D.N.Y. 2009)).  "An ALJ must weigh opinions from

other sources based on: (1) whether the source examined the claimant; (2) whether the

opinion was rendered by a treating source; (3) whether the source presented relevant

evidence to support the opinion; (4) whether the opinion is consistent with the record as a

whole: (5) whether the opinion was rendered by a specialist in his or her area of expertise; and (6) other factors that tend to support or contradict the opinion." Sirris v. Colvin, No. 15cv1003, 2016 U.S. Dist. LEXIS 144859 at *7-8 (W.D.N.Y. Oct. 19, 2016) (citing 20 C.F.R. §§ 416.927(c)(1)-(6)). An "ALJ should 'explain the weight given to opinions from these other sources, or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ]'s reasoning[.]'" Id. at *8 (quoting S.S.R. 06-03p, 2006 SSR LEXIS 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006)).

As cited above, the ALJ explained both Callahan's opinion on Plaintiff's limitations and the evidentiary weight assigned to those opinions. Plaintiff's complaint here is that the ALJ did not provide a sufficient explanation for that weight because the ALJ did "not identify any evidence inconsistent with the limitations relating to sit, lift, carry and sit for two hours in a day, and the mere disagreement with the level of limitations is inadequate." The ALJ, he claims, also failed to explain why he credited portions of Callahan's report–such as that he Plaintiff could stand for 30 minutes at a time and sit for 60 minutes at a time–while he rejected other portions. Plaintiff also argues that the ALJ failed to properly explain why he rejected non-exertional limitations that Callahan had assigned.

The Court finds that the ALJ properly explained the weight he assigned to Callahan's opinions. As explained above, the ALJ concluded that the record evidence did not support the extent of limitations that Callahan assigned. The ALJ's opinion had explained the medical evidence in detail, citing to the record. His assessment of Callahan's opinion referred to that evidence to explain why the limitations that Callahan suggested were excessive. He also pointed out that the record did not contain any

23

evidence to support some of the restrictions that Callahan suggested, particularly when it came to non-exertional limitations.  While Plaintiff is undoubtedly correct that physical pain can lead to mental difficulties and constraints, the ALJ was also correct to note that the rest of the medical evidence did not provide a record of Plaintiff complaining of non-exertional limitations.  Since the Court's role here is to determine whether substantial evidence exists to support the ALJ's findings, not whether the Court would have reached a different conclusion based on that evidence, the Court cannot find that the ALJ erred by not concluding that Plaintiff suffered from such limitations.

### B.      Credibility Finding

Plaintiff contends that the ALJ erred in finding that his allegations of pain and limitation were "not entirely consistent with the medical evidence."  He argues that the ALJ selectively chose the clinical findings that supported his conclusions and ignored other medical evidence that supported Plaintiff's claims.  The ALJ, he claims, incorrectly found that his activities of daily living did not support his claims of pain.

"When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaint's without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record."  Genier, 606 F.3d at 49 (internal citations omitted).  This determination requires the ALJ "to consider all of the evidence of record, including [claimant's] testimony and other statements with respect to his daily activities."  Id. at 50.  A "misreading" of the medical evidence constitutes a failure to "consider 'all of the relevant medical evidence and other evidence,' and cannot stand."  Id. (quoting 20 C.F.R. § 404.1545(a)(3)).  A finding not

24

supported by the medical evidence is grounds for remand.  See Mariani v. Colvin, 567 Fed.

Appx. 8, 10 (2d Cir. 2014) (remanding for further consideration because "the record

provides no evidence for the ALJ's specific finding that [plaintiff] could use his dominant

right hand for fifty percent of the workday.").

As a general matter, "'[i]t is the function of the Secretary, not [the reviewing courts],

to resolve evidentiary conflicts and appraise the credibility of witnesses, including the

claimant.'" Aponte, 728 F.2d at 591.  Thus, when substantial evidence supports the

Commissioner's decision, "the court must uphold the ALJ's decision to discount a

claimant's subjective complaints of pain."  Id.  While "subjective statements of the individual

as to pain or other symptoms, along with objective medical evidence, must be considered

in making a disability determination, . . . where, after weighing the objective medical

evidence in the record, the claimant's demeanor, and other indicia of credibility, the ALJ

decides to discredit plaintiff's claims of severe and disabling pain, that decision is

supported by substantial evidence."  Pascariello v. Heckler, 621 F. Supp. 1032, 1036

(1985) (citing 42 U.S.C. § 423(d)(5)).

The ALJ concluded that, while Plaintiff's neck, back, and shoulder injuries could be

expected to limit him, "the clinical findings during examinations and the claimant's reported

activities suggest that these conditions are not as severe as he alleges."  R. at 76.  The

ALJ explained this conclusion over the next page and a half of his opinion.  See R. at 76-

78.  He pointed that Plaintiff had not sought medical treatment for his shoulder after his

October 2015 surgery.  Id. at 76.  The ALJ explained how examinations in November and

December 2016 showed limitations, but point out that Plaintiff had continued mobility and

did not seek treatment for his shoulder.  Id.  The ALJ also noted that Plaintiff did not

complain of any neck issues until 2016 and "declined physical therapy or injections for his neck." Id.  The ALJ also engaged in an extensive analysis of the August 2015 consultative examination, noting how the limitations that Dr. Jenouri found were less extensive that the ones that Plaintiff claimed. Id. at 77.  As explained above, the ALJ also discussed Plaintiff's testimony regarding his daily activities and concluded that such ability undermined some of his claims regarding limitations.  Plaintiff's daily activity, the ALJ concluded, "suggest[s] that he is able to lift and carry and stand, walk, and sit consistent with light work." Id. at 78.

The ALJ had substantial evidence for his credibility determination.  He pointed to the ways that the medical evidence supported his conclusions about the Plaintiff's limitations and how that evidence specifically showed fewer constraints than Plaintiff claimed.  He also compared Plaintiff's activities of daily living with his claimed limitations and explained why those activities suggested fewer than the claimed limitations.  While Plaintiff may argue with the ALJ's conclusions, the Court cannot find that the ALJ lacked substantial evidence for them.  The Court will therefore deny the Plaintiff's motion on this basis as well.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is **DENIED.**  The Commissioner's motion for judgment on the pleadings is **GRANTED**.  The Clerk of Court is directed to **CLOSE** the case.

**IT IS SO ORDERED.**

**Dated:**July 6, 2020

Thomas J. McAvoy
Senior, U.S. District Judge

26